IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

STEPHEN RACE,

    Plaintiff,

  v.

BALLY TECHNOLOGIES, INC.,

    Defendant.
    _____/

No. C 07-5475 CW

ORDER DENYING CROSS-MOTIONS FOR SUMMARY JUDGMENT

    This case concerns a dispute over compensation Plaintiff Stephen Race claims he is owed for his service as a director of Defendant Bally Technologies, Inc. The parties now cross-move for summary judgment. The matter was heard on November 6, 2008. Having considered oral argument and all of the papers submitted by the parties, the Court denies both motions.

BACKGROUND

    Bally is a publicly traded Nevada corporation that designs, operates and distributes slot machines and related systems. In May, 2005, Jacques Andre, a member of Bally's Board of Directors and Chair of the Board's Governance and Nominating Committee, contacted Plaintiff and asked whether he would consider serving on the Board. Plaintiff responded that he was interested.

After the Board passed a resolution authorizing Andre to offer Plaintiff a seat on the Board, Andre called Plaintiff and offered him the position. During this conversation, the two discussed the matter of Plaintiff's compensation. At his deposition, Plaintiff testified that, as alleged in the complaint, Andre told him that his compensation would include, among other things, an initial grant of vested options to purchase 50,000 shares of Bally stock, and a grant of vested options to buy 30,000 shares of stock on an annual basis thereafter. Byrnes Dec. Ex. B at 38. These terms are consistent with a resolution passed by Bally's Board on April 22, 2003. Both parties agree that this resolution governs director compensation.[1] Pursuant to the resolution, Board members each receive $50,000 a year in compensation, plus $5,000 a year for each committee on which they serve as a chairperson. With regard to stock options, the resolution provides:

> [E]ach newly-appointed, non-management, non-employee director shall be awarded an initial grant of options to acquire 50,000 shares of the company's common stock, vesting on the date of the appointment.
>
> [E]ach non-management director shall be granted options to acquire 30,000 shares of the company's common stock each year on the date of the annual meeting of shareholders, vesting immediately upon grant.

Race Dec. Ex. B at 3.

Another Board resolution, passed on October 27, 2004, further provides:

---

[1] The parties dispute the details of what Andre told Plaintiff regarding compensation. Although the terms of Plaintiff's compensation were governed by the April, 2003 resolution rather than by Andre's representations, the dispute may be material insofar as the discussion is parol evidence of the meaning of the Board resolution.

2

> [T]he options awarded to directors at the time of each annual meeting of shareholders shall be prorated on a monthly basis for directors appointed or elected after the previous annual meeting, as follows: Directors elected at or appointed not more than one calendar month before the annual meeting will not receive the annual grant, and directors appointed more than one calendar month before the annual meeting will receive one-twelfth of the annual grant for each full calendar month by which the director's appointment precedes the annual meeting. For example, if the annual grant is 30,000 options and the annual meeting is on December 10, a director appointed on the [sic] October 10 of the same year will receive two-twelfths of the annual grant, or 5,000 options, and a director appointed on the [sic] October 11 will receive one-twelfth of the annual grant, or 2,500 options.

Race Dec. Ex. E at 4.

Plaintiff does not contend that Andre specifically told him that his compensation would be governed by the April, 2003 and October, 2004 resolutions. Rather, he states that Andre referred him to Bally's proxy statements for information about his compensation. These proxy statements do contain information about, among other things, director compensation. Plaintiff testified that he reviewed several proxy statements prior to his phone call with Andre, including a statement dated November, 2003. This statement contains information about director compensation that is consistent with the April, 2003 Board resolution. See Race Dec. Ex. A at 16. In any event, the parties agree that director compensation is not actually set by the statements, regardless of Plaintiff's understanding at the time of his conversation with Andre, but by resolution of the Board. Plaintiff did not believe at any time that Andre had the authority to vary the terms of compensation from those that were set by the Board. Byrnes Dec. Ex. B at 57.

3

1    Race joined the Board on June 30, 2005 and immediately
2 received 50,000 fully vested options.  Although Bally Board members
3 ordinarily serve three-year terms, Race took over the Board seat of
4 another director who had left his position before completing his
5 term.  The term was scheduled to expire on the date of the 2007
6 annual shareholder meeting.  Plaintiff's term was thus expected to
7 last approximately two years, until the spring of 2007.

8    The next annual shareholder meeting after Plaintiff joined the
9 Board took place slightly more than eight months later, on March 6,
10 2006.  Pursuant to the October, 2004 resolution, Plaintiff was
11 granted 20,000 options on the date of this meeting, representing
12 eight-twelfths of the 30,000 shares to which each director was
13 ordinarily entitled on an annual basis.

14    The 2007 annual shareholder meeting was held on May 3.  As
15 noted, Plaintiff's term was set to expire on the date of this
16 meeting.  Plaintiff served out his term, but decided not to run for
17 re-election.  Prior to the meeting, Plaintiff inquired about the
18 30,000 shares that he believed were due to him on the date of the
19 meeting.  Bally responded that it would not grant him these options
20 because, in its view, he was not entitled to them.

21    At the May 3 meeting, the Board passed a resolution re-
22 structuring director compensation:

> Except as provided below with respect to newly-appointed
> directors, each director shall receive, beginning
> following the annual meeting of shareholders scheduled
> for May 3, 2007, and thereafter each year on the first
> trading day of each calendar year, a grant of $125,000
> worth of options plus a grant of $125,000 worth of
> restricted stock, in each case for the director's service
> for the following year. . . .  The options shall be fully
> vested (i.e., exercisable) upon grant, and the restricted

4

> stock shall vest on the first anniversary of the grant date.
>
> The number of options awarded to new directors appointed hereafter shall be prorated based on the number of days between the effective date of the director's appointment and the next date of the annual grant (but not more than 365). For example, if a director is appointed effective October 21, and the first trading day of the next calendar year will be 73 days later on January 2, the new director would receive, on appointment, $25,000 worth of options (73/365 x $125,000 = $25,000) plus $125,000 worth of restricted stock.
>
> New directors, whether elected at an annual meeting of shareholders or appointed between such meetings, shall receive an initial grant of options to acquire 50,000 shares of the company's stock on the date of election or appointment at a price equal to the closing price on the grant date and vesting in three equal installments on the first, second and third anniversaries of the director's election or appointment.

Race Dec. Ex. F at 3-4. The Board also considered Plaintiff's position that he was entitled to 30,000 options. It voted "to reconfirm its existing position on the matter: [] that a director whose tenure as a director ends as of the date of a shareholder meeting is not entitled to options granted to directors as of the date of that meeting." Id. at 6.

Plaintiff filed this lawsuit charging Bally with breach of contract. He seeks an injunction requiring Bally to award him the 30,000 options he claims he was owed at the May, 2007 meeting.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

5

Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if it is supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or

6

1 defense, it is not required to produce evidence showing the absence
2 of a material fact on such issues, or to support its motion with
3 evidence negating the non-moving party's claim.  Id.; see also
4 Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v.
5 NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the
6 moving party shows an absence of evidence to support the non-moving
7 party's case, the burden then shifts to the non-moving party to
8 produce "specific evidence, through affidavits or admissible
9 discovery material, to show that the dispute exists."  Bhan, 929
10 F.2d at 1409.

11 If the moving party discharges its burden by negating an
12 essential element of the non-moving party's claim or defense, it
13 must produce affirmative evidence of such negation.  Nissan, 210
14 F.3d at 1105.  If the moving party produces such evidence, the
15 burden then shifts to the non-moving party to produce specific
16 evidence to show that a dispute of material fact exists.  Id.

17 If the moving party does not meet its initial burden of
18 production by either method, the non-moving party is under no
19 obligation to offer any evidence in support of its opposition.  Id.
20 This is true even though the non-moving party bears the ultimate
21 burden of persuasion at trial.  Id. at 1107.

22 Where the moving party bears the burden of proof on an issue
23 at trial, it must, in order to discharge its burden of showing that
24 no genuine issue of material fact remains, make a prima facie
25 showing in support of its position on that issue.  UA Local 343 v.
26 Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That
27 is, the moving party must present evidence that, if uncontroverted

28                                   7

at trial, would entitle it to prevail on that issue. Id. Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

                              DISCUSSION

I.   Existence of a Contract

Bally argues that Plaintiff may not pursue a claim for breach of contract because the parties never entered into a contract. Bally's argument is based on Nevada statutory law, which states, "Unless otherwise provided in the articles of incorporation or the bylaws, the board of directors, without regard to personal interest, may establish the compensation of directors for services in any capacity." Nev. Rev. Stat. § 78.140(5). Consistent with this statute, Bally's bylaws provide, "Directors . . . shall be entitled to such reasonable compensation for their services . . . as shall be fixed from time to time by resolution of the Board of Directors . . . . The compensation of directors may be on such basis as is determined by the resolution of the Board of Directors." Byrnes Dec. Ex. G at 9.

Neither party has cited any case brought by a corporate director to recover compensation he or she claimed was owed in exchange for his or her service on the board. In the absence of authority holding that no contract claim may be brought under such circumstances, the Court turns to ordinary principles of contract

8

law to determine whether the parties entered into a contract. California law provides, "It is essential to the existence of a contract that there should be: 1. Parties capable of contracting; 2. Their consent; 3. A lawful object; and, 4. A sufficient cause or consideration." Cal. Civ. Code § 1550.[2]

Here, Andre, acting on Bally's behalf pursuant to a Board resolution, offered Plaintiff a position as a director. It is undisputed that all parties understood that Bally would compensate Plaintiff for his services. The precise terms of this compensation were determined by resolution of the Board. When Plaintiff accepted Bally's offer, a contract was formed. Provided Plaintiff discharged his duties, Bally was obliged to compensate him in accord with the Board's resolutions.[3]

Nothing in this analysis is contrary to Nevada law, which simply provides that "the board of directors . . . may establish the compensation of directors." Nev. Rev. Stat. § 78.140(5). Plaintiff does not dispute the authority of the Board to determine the compensation of Bally's directors, nor does he argue that the Board lacked the authority to change prospectively the terms of his

---

[2] Although Bally asserts that Nevada law should apply to the contract claim, it does not argue that the result would differ under principles of Nevada contract law.

[3] It is of no consequence that Plaintiff understood that the terms of his compensation were contained in the proxy statement. The November, 2003 proxy statement that Plaintiff reviewed sets out terms of director compensation that comport with the April, 2003 resolution. Nor is Plaintiff attempting to proceed under a set of facts that differs from that which is contained in the complaint. Although the complaint does not specifically state that Plaintiff's compensation was governed by the April, 2003 resolution, it alleges as a contractual term a compensation scheme that is based on the provisions of the resolution.

9

compensation during the course of his service as a director. But Bally has cited no authority for the proposition that, once the Board has passed a resolution that governs director compensation, Bally is free to violate such a resolution or retroactively change its terms. And while Bally asserts that a contract claim is not the proper vehicle for challenging its actions as contrary to the Board's resolutions, it has not identified an appropriate alternative cause of action.

II. Terms of the Contract

As explained above, the April, 2003 Board resolution provides that new directors receive an initial grant of 50,000 vested options. It also provides that each director shall be granted 30,000 options "each year on the date of the annual meeting of shareholders, vesting immediately upon grant." It is not explicit in this language whether a director will receive 30,000 options on the date of the shareholder meeting that marks the end of his or her service.

Plaintiff argues that the annual grant of options is meant as compensation for the previous year's service, and that he is therefore owed 30,000 options as compensation for his service between the March, 2006 and May, 2007 shareholder meetings. This interpretation finds support in the Board's October, 2004 resolution, which provides that a director who has served less than one year as of the date of a shareholder meeting will receive only a portion of the 30,000 options that would otherwise be due at the meeting. This appears to ensure that directors are paid for only the amount of time they have actually served over the course of the

10

previous year. However, as Bally points out, if the April, 2003 resolution is interpreted as establishing a system where options are granted as compensation for the next year's service, the proration provided by the October, 2004 resolution has the same effect of ensuring that directors are paid according to the length of their service: If the initial 50,000 options are considered payment for the period between the director's appointment and the next annual meeting, and the prorated options are considered compensation for the next full year's service, with 30,000 options paid each year thereafter, over the long-term, the proration ensures that the total compensation a director receives is proportional to the total number of months he or she has served.[4]

The fact that newly appointed directors receive an initial grant of 50,000 shares likewise is not dispositive. Plaintiff maintains, with some support in the record, that these shares are a "signing bonus" meant to compensate for the burdensome process of obtaining regulatory approval to serve as a director, and do not represent compensation for any of the time served. However, the concept of providing a signing bonus is not inconsistent with the view that the initial grant also represents compensation for the first full year of service. Under this view, Bally provides extra

---

[4] Bally argues that a grant of options cannot possibly represent compensation for past service as a director, because the fact that the exercise price of the options is based on the stock's value at the time of the shareholder meeting would motivate the director to sabotage the corporation during the preceding year in order to push the stock price down. Aside from being purely speculative, this argument applies equally to stock options granted to a director as prospective compensation, at least until the last year of the director's service.

11

compensation for a director's first year, then a prorated grant to correct for the fact that the director is receiving additional options before a full year has gone by, then 30,000 options for each year thereafter.[5]

The extrinsic evidence does not clarify the ambiguity in the April, 2003 resolution. On the one hand, there is evidence that the 30,000 shares have been treated by Bally and its directors as representing prospective compensation. For example, the Chairman of Bally's Compensation Committee has submitted a declaration in which he states that, during the time he has served on the Board, Bally "has never issued options to a departing director on his or her last day of service." Verner Dec. ¶ 12. Plaintiff asserts, however, that the reason no director was given 30,000 options on his or her last day of service is that no director left Bally on the last day of his or her term during the time the April, 2003 resolution was in effect. Bally also notes that no director received a grant of 30,000 options at the May, 2007 meeting. Id. ¶ 11(a). But the significance of this fact is not clear, in that the Board made fundamental changes to the compensation structure at the May, 2007 meeting. Supporting Plaintiff's view that the

---

[5] Under a prospective compensation system, a director could resign shortly after the shareholder meeting while already having been compensated for the upcoming year. "In response to this concern, Bally limits the exercise term of the options if a director leaves before the end of his term, to ensure that Bally and its shareholders are not shortchanged in such a situation. If a director resigns early, he has only 60 days instead of 10 years to exercise his options." Verner Dec. ¶ 13. Because the value of Bally's stock is not likely to have risen substantially from the exercise price in such a short amount of time, the benefit obtained by the director will be minimized.

12

options constituted retrospective compensation is the fact that Bally's January, 2008 proxy statement indicates that Plaintiff earned no equity during the 2007 fiscal year, which lasted from July 1, 2006 through June 30, 2007.  But Bally contends that the proxy statement simply indicates that Plaintiff was not <u>granted</u> any options during this time period.

In sum, although the language of the April, 2003 and October, 2004 resolutions supports Plaintiff's claim, the resolutions are nonetheless ambiguous.  The conflicting extrinsic evidence is sufficient to create a triable issue of fact as to whether Plaintiff is owed 30,000 shares for his last year of service on Bally's Board.  Accordingly, neither party is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment (Docket Nos. 47 and 55) are DENIED.  This action will proceed to trial as scheduled.

IT IS SO ORDERED.

Dated: 11/25/08

CLAUDIA WILKEN
United States District Judge

13